**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

SEMINOLE TRIBE OF FLORIDA,

     Plaintiff,

                                         CONSOLIDATED CASE

v.                                   CASE NO.: 4:15-cv-516-RH/CAS

STATE OF FLORIDA,

     Defendant.

_____/

**<u>STATE OF FLORIDA'S CLOSING BRIEF</u>**

I.   The State proved its claims. ................................................................3

II.  No exception to the Tribe's obligation to wind down banking or banked
     card games has been triggered. .........................................................3

     A.   The meaning of "permit." ...........................................................4

     B.   Under the Florida Constitution's separation of powers, a division of
          the executive branch lacks authority to modify or waive State law ..........8

     C.   The Division of Pari-Mutuel Wagering's regulation of designated
          player games did not "permit" banking or banked card games. ..............9

          1.   The Division enforces the cardroom statute permitting poker
               games and prohibiting games in which the cardroom
               "establishes a bank." ...............................................11

          2.   The Division promulgated regulations to prevent cardrooms
               from conducting designated player games in a manner that
               "establishes a bank." ...............................................13

          3.   The Division has taken administrative action upon discovery
               of designated player games conducted in a manner that
               "establishes a bank." ...............................................26

     D.   The operation of blackjack-themed slot machines is not permission
          of "banking or banked card games." .......................................30

          1.   Multi-station blackjack-themed slot machines existed in 2009....30

          2.   Use of a live attendant does not transform blackjack-themed
               slot machines into "banking or banked card games." ...............33

          3.   Neither the State nor the Tribe intended for the term "banking
               or banked card games" to include blackjack-themed slot
               machines ...........................................................34

          4.   DBPR has enforced State law to protect the Tribe's exclusivity
               for slot machines. .................................................35

III. The Tribe's remedies are confined to those agreed upon in the 2010
     Compact. .................................................................................35

IV.  The State has no legal obligation to renegotiate the 2010 Compact. ...............37

     A.   Eleventh Amendment and sovereign immunity bar, and regardless
          the Tribe did not prove, its Count II good faith claim. ..........................37

     B.   The 2010 Compact contains no obligation to renegotiate......................38

V.   The State negotiated in good faith. ..................................................40

VI.  Conclusion ...........................................................................41

The Defendant, STATE OF FLORIDA, by and through its undersigned attorneys, submits the following brief in support of its closing argument:

## I.     The State proved its claims.

The State proved its Count I claim that the Tribe breached the 2010 Compact. It is without dispute that the Tribe agreed that it would wind down its banking card games five years from the Effective Date of the 2010 Compact. Trial Tr. [hereinafter "**Tr.**"] 97:4–7. The evidence at trial established that the deadline and the grace period have passed. The Tribe continues to operate the games. The 2010 Compact defines the State's remedy for this exact type of breach, and that agreed-upon remedy is an injunction. For these same reasons, the State proved its Count II claim—that the Tribe has conducted Class III gaming that is not permitted under the 2010 Compact. 25 U.S.C. § 2710(d)(7)(A)(ii). The State's remedy for Count II is also an injunction.

## II.    No exception to the Tribe's obligation to wind down banking or banked card games has been triggered.

There are only two circumstances provided for in the 2010 Compact that would allow the Tribe to continue to offer banking or banked card games. State Ex. 1 at Part XVI. Under Part XVI.C, the authorization for banking or banked card games would not automatically terminate if the Tribe and the State Legislature

agreed to renew the Tribe's authorization.[1]   Under Part XVI.B, the authorization would not automatically terminate if the State through its law-making process triggered the "permits [others] . . . to conduct such games" clause.   Neither has occurred.   *See* Tr. 118:8–15; 119:1–13.

The 2010 Compact's provision regarding loss of exclusivity, wholly laid out in Part XII.A, confirms that there are only three ways for the State to "permit[] . . . [others] to conduct such games": (1) an amendment of the Florida Constitution; (2) an enactment of the Florida Legislature; or (3) a Court decision or administrative ruling or decision.   None of those three things has occurred.   *See* Tr. 118:8–15; 119:1–13.

A.    The meaning of "permit."

The parties clearly understood what it meant for a state to "permit" a form of gaming when they included that term in Part XVI.B of the 2010 Compact.   Whether and how a state permits certain forms of gaming has played a key role in the historical development of Indian gaming generally and the relationship between these two parties specifically.   Several cases have addressed the meaning of that term, including the Indian gaming case decided by the United

---

[1] This is echoed by Part XVII.B which provides that "*Legislative ratification is required for any amendment to the Compact that alters the provisions relating to* Covered Games, the amount of revenue sharing payments, suspension or reduction in payments, *or exclusivity*." (emphasis added).

States Supreme Court that led to the enactment of the Indian Gaming Regulatory Act ("**IGRA**"), *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), the Florida Supreme Court's decision in *Florida House of Representatives v. Crist*, 999 So. 2d 601 (2008), and a 1993 Southern District of Florida case between the Tribe and the State, *Seminole Tribe of Fla. v. State of Fla.*, 1993 WL 475999 (S.D. Fla. Sept. 22, 1993).

Because the manner in which a state "permits" gaming played such a prominent role in the historical context of Indian gaming generally and the 2010 Compact specifically, there can be no question that the parties shared a common understanding that the State only permits a form of gaming if there is no criminal prohibition on it and any state law addressing that form of gaming is merely regulatory in nature.

In *Cabazon*, the Supreme Court adopted a prohibitory/regulatory distinction that had been used by other courts[2] in evaluating whether a state permitted certain forms of gaming.  *Cabazon* held that a state does not permit a form of gaming that is criminally prohibited under its laws, and a form of gaming that is not criminally prohibited will be considered "permitted" if it is merely regulated under state law.  *Id.* at 209.

---

[2] Including the Fifth Circuit in deciding a dispute between the Tribe and the Sheriff of Broward County in 1981.  *See Seminole Tribe of Florida v. Butterworth*, 658 F.2d 310 (1981), *cert. denied*, 455 U.S. 1020 (1982).

After *Cabazon*, Congress enacted the IGRA, specifically adopting the reasoning of the *Cabazon* case. Thereafter, the Tribe sued the State and its governor in the Southern District of Florida, alleging that the State failed to negotiate in good faith as required by the IGRA. *See Seminole Tribe*, 1993 WL 475999. The Tribe alleged that the State must negotiate with the Tribe over certain forms of gaming but had declined to do so. *Id.* at *2. Because the IGRA only requires a state to negotiate over a form of gaming if the state "permits such gaming," and the State's laws prohibited the gaming at issue, the State argued that the forms of gaming at issue were not mandatory subjects of negotiation under the IGRA. *Id.* at *2.

Judge Marcus considered the Tribe's argument that the State's permission of *some* Class III games in the State entitled the Tribe to demand compact negotiations under IGRA for *all* Class III games. The Tribe cited *Cabazon* for the proposition that the State's authorization of pari-mutuel facilities and a State lottery "evinced a public policy which is regulatory in nature toward all forms of Class III gaming" and therefore all forms of Class III gaming must be subject to mandatory negotiation under IGRA. *Id.* at *6. The court rejected this argument as well, stating that "we cannot accept the Tribe's broad assertion that the State's permission of specific Class III gaming activities places *all* Class III activities on the table as subject to negotiation." *Id.* (emphasis in original).

The Tribe further argued that the State's alleged failure to enforce its gaming laws "permitted" gaming, which entitled the Tribe to demand that such gaming be included as mandatory subjects of negotiation.  The court rejected this argument, stating "[t]he Tribe's argument that the failure of local prosecutors to prioritize and prosecute sporadic and apparently infrequent casino night activities converts an activity expressly prohibited by the criminal statutes of the State into one which is permitted by the public policy of the State resembles the argument presented to and rejected by the Florida Supreme Court [in *State v. Egan*, 287 So. 2d 1 (Fla. 1973)[3]]." *Id.* at *13.[4]  "[D]esuetude has been rejected as a general theory of legislation by the Florida Supreme Court." *Id.* at *12.

Following former Governor Crist's execution of the 2007 Compact, the Florida House of Representatives petitioned the Florida Supreme Court for a writ of *quo warranto* on the grounds that the Governor lacked authority to bind the State to a compact that violated State law without ratification or authorization from the Legislature. *See House of Reps.*, 999 So. 2d 601.  Following intervention and

---

[3] In *State v. Egan*, the Florida Supreme Court rejected the argument that the infrequent use of common law crimes to prosecute individuals had caused those arguments to cease to exist, and stated that "a legislative enactment may be repealed only by further legislation and not by time or changed conditions . . . . Simply stated, the general rule is that a statute is not repealed by nonuse. . . ." 287 So. 2d at 7.

[4] Local prosecutors in the State Attorneys' Offices throughout Florida are primarily responsible for enforcing the criminal statutes.

briefing by the Tribe, the court recognized that Florida law generally prohibits gambling but "permits" limited forms of gaming through either the Florida Statutes or the Florida Constitution, and criminally prohibits banking games by statute. *Id.* at 614.

Seventeen years after Judge Marcus ruled on the meaning of "permits such gaming" in the context of the IGRA, and two years after the Florida Supreme Court reiterated that the State permits gaming by way of statutes or amendment to its Constitution, the State and the Tribe included the same "permits such gaming" language in the 2010 Compact.  Their mutual understanding of what "permits such gaming" was intended to mean is reflected in the case law and specifically Judge Marcus's order, which held that the State did not permit a form of gaming that it criminally prohibited, and recognized that "[e]ach case interpreting the IGRA which found state permission of a Class III gaming activity presented some form of explicit legislative approval of the activity within the State's territory." *Id.* at *14.

**B.    Under the Florida Constitution's separation of powers, a division of the executive branch lacks authority to modify or waive State law.**

Article II, Section 3 of the Florida Constitution provides that "[t]he powers of the state government shall be divided into legislative, executive and judicial branches.  No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein."  Fla.

Const, Art. II, Sec. 3. "Enacting laws—and especially criminal laws—is quintessentially a legislative function." *House of Reps.*, 999 So. 2d at 615. The executive of the State lacks authority to authorize a game that is illegal under Florida law, *see id. at 615-16*, and it follows that even if a division of a department that is within the executive branch intended to authorize an illegal game,[5] an arm of the executive branch has no greater power to alter State law than the Governor. *Id.* ("Neither the Governor nor anyone else in the executive branch has the authority to execute a contract that violates state criminal law.").

### C.   The Division of Pari-Mutuel Wagering's regulation of designated player games did not "permit" banking or banked card games.

A poker game that uses a designated player format is not by definition a "banking game." State law permits poker and does not prohibit cardrooms from conducting poker in a designated player format. State law does, however, prohibit cardrooms from conducting any game, including designated player games, in a banking manner. § 849.086, Florida Statutes. All of the evidence at trial proved that the intent of the Department of Business and Professional Regulation ("**DBPR**") in promulgating 61D-11.002(5) was to permit poker-style games and prohibit poker games played in a designated player format from being played in a banking manner.

---

[5] The evidence here shows no such intent.

DBPR, through its Division of Pari-Mutuel Wagering (the "**Division**"), is both authorized and required to regulate and monitor licensed gaming establishments in the State. *Id*. When cardrooms began offering designated player games,[6] the Division promulgated rules to ensure that the cardrooms did not conduct the games in a manner that established a bank against which participants play. The evidence showed that the Division took administrative action, subject to the normal requirements of due process under Chapter 120, Florida Statutes, when it had reason to believe that a cardroom had conducted a designated player game in a manner that established a bank.

---

[6] Card games with a designated player existed in other jurisdictions as Class II card games at least a decade before the parties entered into the 2010 Compact. *See* State Ex. 54; Tribe Ex. 48. A 1995 NIGC opinion letter described how the game was played in a non-banking manner:

> The position of dealer rotates systematically among the players and each player has the opportunity to act as the dealer for two consecutive rounds. The player/ dealer makes the initial bet, and the other players bet against him. The player/dealer pays off winners and collects from losers, but only until the player/dealer wins or loses his initial wager. Thereafter, the round of play terminates even though there are remaining players at the table who have winning or losing hands. Accordingly, the player/dealer is not required to pay all winners, and the player/dealer may only collect from losers up to the amount the player/dealer wagered.

State Ex. 54.

**1.    The Division enforces the cardroom statute permitting poker games and prohibiting games in which the cardroom "establishes a bank."**

As an exception to its prohibition of gambling, the State permits licensed cardrooms to offer "authorized games," which according to legislative intent expressly written into the cardroom statute "are considered to be pari-mutuel style games and not casino gaming because the participants play against each other instead of against the house." § 849.086(1), (3), (7), Fla. Stat. [7]   The cardroom statute requires DBPR to "administer this section and regulate the operation of cardrooms under this section," and it authorizes DBPR to, among other things, adopt rules and monitor cardrooms. *Id.* § 849.086(4).

DBPR does not have authority to "define poker" or limit cardrooms' innovation of poker-style games with rules of play that vary from traditional five-card poker. *St. Petersburg Kennel Club v. DBPR*, 719 So. 2d 1210, 2011 (Fla. 2d DCA 1998); *see* Tr. 367:2–368:12.  Nor does DBPR have authority to "approve games." *Calder Race Course, Inc. v. DBPR*, Case No. 04-2950RX (Fla. DOAH Dec. 21, 2004), *aff'd per curiam sub nom., DBPR v. Calder Race Course, Inc.*, 913 So. 2d 601 (Fla. 1st DCA 2005); *see* Tr. 367:2–368:12.

---

[7] Whereas the 2010 Compact authorizes the Tribe to conduct "banking or banked card games" which are Class III games under IGRA, State law authorizes cardrooms to conduct games which would be considered Class II card games under IGRA, 25 U.S.C. § 2703(7)(A).

But the Division is authorized to promulgate regulations that prohibit the conduct of a "banking game" in which the cardroom participates in the game or establishes a bank against which participants play.   §§ 849.086(4) and 550.0251(12), Fla. Stat.; *id.* § 849.086(2)(b), (12)(a).   Rulemaking is required of the Division under § 120.54(1)(a) Florida Statutes, and the Division has an affirmative duty under § 849.086, Florida Statutes, to enforce the cardroom statute's prohibition of banking games at licensed cardrooms.

The cardroom statute defines "house" as "the cardroom operator and all employees of the cardroom operator,"[8] and it defines "authorized game" as "a game or series of games of poker or dominoes which are played in a nonbanking manner."   *Id.* § 849.086(2)(a), (j).[9]   Cardrooms are prohibited from conducting a "banking game," which the cardroom statute defines as "a game in which the house is a participant in the game, taking on players, paying winners, and

---

[8] Mr. Kilby's opinion ignores the cardroom statute and its definition of "house," and instead is based on the definition of "house" including anyone who covers other players' wagers. *See* Tr. 152:5–12; 153:7–13; 173:13–25.

[9] The cardroom statute also defines "cardroom operator" as "a licensed pari-mutuel facility" that holds a cardroom license issued by DBPR, *id.* § 849.086(2)(f), and it defines "cardroom" as "a facility where authorized games are played for money or anything of value and to which the public is invited to participate in such games and charged a fee for participation by the operator of such facility," and clarifies that "[a]uthorized games and cardrooms do not constitute casino gaming operations." *Id.* § 849.086(2)(c).

collecting from losers or in which the cardroom establishes a bank against which participants play." *Id.* § 849.086(2)(b), (12)(a).[10]

> **2.    The Division promulgated regulations to prevent cardrooms from conducting designated player games in a manner that "establishes a bank."**

In accordance with its regulatory authority, the Division promulgated Florida Administrative Code 61D-11.002(5), which imposes specific requirements for "[c]ard games that utilize a designated player that covers other players' wagers." The regulation defines "designated player" as "the player identified by the button as the player in the dealer position." Fla. Admin. Code R. 61D-11.001(17). To prevent cardrooms from operating designated player games in a

---

[10] In prior litigation in 2007, the Tribe agreed with this definition and argued it should apply. *See* State's Req. Judicial Notice App. 12, Tribe's Resp. Opp. to Pet. Writ Quo Warranto, *Fla. House Reps. v. Charlie Crist*, at 31 n.23 (Dec. 3, 2007).

manner that "establishes a bank,[11] 61D-11.002(5) includes three requirements for the cardrooms' "house rules." Tr. 385:13–386:21.

First, "[t]he house rules shall . . . [e]stablish uniform requirements to be a designated player." Fla. Admin. Code R. 61D-11.002(5)(a).[12]  This requirement prevents cardrooms from giving certain players preferential treatment while depriving other players of the opportunity to be the designated player.  Prohibiting preferential treatment affords all players an equal opportunity to be the designated player and ensures that cardrooms do not keep one player in the designated player position throughout the game.

Second, "[t]he house rules shall . . . [e]nsure that the dealer button rotates around the card table in a clockwise fashion on a hand by hand basis to provide

---

[11] Because cardrooms do not "participate" in designated player games, the key issue is whether the cardrooms are conducting the games in a manner which "establishes a bank."  Merriam-Webster dictionary defines "establish" as "to put (someone or something) in a position, role, etc., that will last for a long time" or "to begin or create (something that is meant to last for a long time)." *Establish*, Merriam-Webster Online Dictionary, *available at* http://www.merriam-webster.com/dictionary/establish (last visited Oct. 14, 2016); *see Raymond James Fin. Services, Inc. v. Phillips*, 126 So. 3d 186, 190 (Fla. 2013) ("As this Court has held, '[w]hen considering the meaning of terms used in a statute, this Court looks first to the terms' ordinary definitions, . . . definitions [that] may be derived from dictionaries." (quoting *Metro. Cas. Ins. Co. v. Tepper*, 2 So.3d 209, 214 (Fla. 2009))).

[12] One significant issue in this case was caused because cardrooms exploited 61D-11.002(5)(a) by creating "uniform requirements" in their "house rules"—that are not required to be submitted to the Division—under which they conducted designated player games in a manner inconsistent with their internal controls and which established a bank. Tr. 307:4–19.

14

each player desiring to be the designated player an equal opportunity to participate as the designated player."  Fla. Admin. Code R. 61D-11.002(5)(b).  Using the "button" commonly used in other poker games, this requirement provides the specific method by which cardrooms must rotate the opportunity to participate as the designated player.  Like the provision on preferential treatment, the requirement of the rotation of the designated player button ensures that cardrooms do not keep one player in the designated player position throughout the game.

Third, "[t]he house rules shall . . . [n]ot require the designated player to cover all potential wagers."  Fla. Admin. Code R. 61D-11.002(5)(c).  This requirement ensures that cardrooms offer designated player games with poker-style rather than banking-style wagering.  In a poker game, all players choose the amount that they are willing to wager during each hand and may choose any amount within the range of potential wagers between the table minimum and the table limit.  In a banking game, one player must cover **all** potential wagers between the table minimum and the table limit so that during the hand all amounts wagered

by the other players are covered.  The Division intended for 61D-11.002(5)(a)–(c) to prevent establishment of a bank.[13]

The Division created the three requirements discussed above to prevent cardrooms from operating designated player games in a manner which "establishes a bank."  The requirements are very similar to California's requirements which ensure that a card game is not a banking game:

> "Banking game" or "banked game" does not include a controlled game if the published rules of the game feature a player-dealer position and provide that this position must be continuously and systematically rotated amongst each of the participants during the play of the game, ensure that the player-dealer is able to win or lose only a fixed and limited wager during the play of the game, and preclude the house, another entity, a player, or an observer from maintaining or operating as a bank during the course of the game. For purposes of this section it is not the intent of the Legislature to mandate acceptance of the deal by every player if the division finds that the rules of the game render the maintenance of or operation of a bank impossible by other means. The house shall not occupy the player-dealer position.

---

[13] Mr. Kilby testified several times, and Dr. Jacobson agreed, that a banking game is one where the banker pays *all* winners and collects from *all* losers.  *See* Tr. 152:10–12; 155:18–24; 183:2–8; 306:7–19.  Dr. Jacobson gave the example of a situation where the designated player was only willing to wager $10 but another player wanted to bet $15.  Tr. 306:7–307:3.  Whereas poker-style wagering does not require a player to cover all other potential wagers, banking-style wagering requires the bank to cover all potential wagers within the table limits.  Requiring the designated player in Dr. Jacobson's example to cover the $15 wager would establish banking-style wagering.  Alternatively, allowing the designated player in Dr. Jacobson's example to only cover $10 of the $15 establishes poker-style wagering.

Cal. Penal Code § 330.11.

Accordingly, 61D-11.002(5) prohibits cardrooms from keeping one player in the designated player position throughout the game, and, in addition, prohibits cardrooms from requiring that player to cover all potential wagers.  The State's expert testified that games played in violation of 61D-11.002(5) are banking games:

> And by virtue of not offering the button in rotation, or creating prohibitive standards by which players at the table could accept the button in rotation, these cardrooms are also violating the intent that every player seated at the table should have an equal opportunity to sit on the button, which is exactly why the game is a fair game, a poker-style game, that every player should be able to gain that mathematical advantage by virtue of being on the button.

Tr. 304:16–305:1.

The Division did not adopt 61D-11.002(5) with the intention of permitting cardrooms to conduct banking games.[14]  To the contrary, the Division adopted 61D-11.002(5) with the intention of preventing cardrooms from conducting banking games.  Constrained by its inability to limit the definition of poker, *see St. Petersburg Kennel Club*, 719 So. 2d at 1211, the Division could not promulgate regulations that prohibited cardrooms' innovation of poker-style games using a

---

[14] There was no evidence that the Division had any bad faith intent or any intent at all to permit banking games in licensed cardrooms.

designated player format.   Tr. 367:2–368:12.[15]   It could only promulgate regulations which imposed requirements intended to ensure that cardrooms did not play designated player games in a banking manner.  Tr. 367:2–368:12.

Mr. Zachem testified that in promulgating 61D-11.002(5), the Division researched statutes in other jurisdictions.   Tr. 440:13–21.   61D-11.002(5)'s requirements are very similar to the requirements California has imposed to prevent its cardrooms from conducing designated player games in a banking manner.  *See* Cal. Penal Code § 330.11.  Dr. Jacobson testified that designated player games have been played in California since the early 1990s in Class II cardrooms where banking games were prohibited.  Tr. 299:12–22.

### a.   There is no evidence that card games played in accordance with the requirements of 61D-11.002(5) are banking games.

The Tribe's expert, Mr. Kilby, opined that poker games played in a designated player format that he observed in November 2015 and January 2016 were being played in a banking manner.  Importantly, Mr. Kilby testified that his opinions were not based on 61D-11.002(5) and that he did not consider that provision in reaching his opinions.  The games Mr. Kilby observed are the same

---

[15] Mr. Biegalski testified that the Division's regulatory role is "reactionary" in that the Division does not define or approve authorized games but instead monitors cardrooms, promulgates regulations through its rule-making process, and takes administrative action to enforce the cardroom statute.  Tr. 364:23–365:24.

games for which the Division initiated administrative proceedings to shut down. Those games were not played in accordance with 61D-11.002(5).

Florida Administrative Code 61D-11.002(5) does not, and as a matter of law cannot, permit a cardroom to "establish a bank against which participants play" for the reasons that (1) the players are not employees of the cardroom; (2) the players, not a house employee, are the dealer; (3) the cardroom is required to rotate the dealer button; and (4) the players are not required to cover all potential wagers. A "designated player" game is a poker game. The poker game is being played only by the players. The cardroom is not a player in the card game. The "designated player" poker game is nothing more than a poker game amongst the players in which each player, including the "designated player," decides the total amount that the player will put in the card game pot and a player, not the cardroom, will win and collect the winnings.

The 2010 Compact entered into between the State and the Tribe does not modify this analysis. Rather, the 2010 Compact expressly requires its adoption. Part IX of the 2010 Compact expressly and unequivocally states that "[t]he obligations and rights of the State and the Tribe under this Compact are contractual in nature, and are to be construed in accordance with the laws of the State of Florida." This provision of the 2010 Compact is binding on the Tribe. Section 11(d)(3)(C) of IGRA expressly provides that the 2010 Compact entered into

between a State and a Tribe may include provisions relating to the application of the criminal and civil laws of the State.  25 U.S.C. § 2710(d)(3)(C)(i) and (vii).

The 2010 Compact itself does not define the phrase "banking or banked card game" but, as noted above, Florida law does define a banking game in Section 849.086 in the context of card games allowed to be played in Florida's licensed cardrooms.

Mr. Kilby's sweeping definition of a banking game is not supported by any substantive statute, case, or regulatory authority.  To the contrary, it ignores every bit of applicable State law that governs the interpretation of the 2010 Compact.

Unlike Mr. Kilby's unsupported definition, the State's definition of a "banking" game is supported by (1) the 2010 Compact's requirement that it be construed in accordance with Florida law, (2) Section 849.086 of the Florida Statutes and, in addition, (3) 25 C.F.R. § 502.11, promulgated by the National Indian Gaming Commission, which expressly defines a "house banking game" as "any game of chance that is played with the house as a participant in the game,

where the house takes on all players, collects from all losers, and pays all winners, and the house can win.".[16]

In summary, the designated player games, when played in accordance with 61D-11.002(5), are not "banking games" or "house banked games."   As such, the designated player games are not Class III games or "Covered Games" under the 2010 Compact.   Rather, they are Class II poker games played in a non-banking designated player format and they are specific exceptions from the exclusivity provision of the 2010 Compact.   As a result, the Division's regulation of designated player games as set forth in 61D-11.002(5) does not constitute a violation of the Tribe's exclusivity or any aspect of the 2010 Compact.

---

[16] The Tribe's reference to NIGC Bulletin 95-1 is not entitled to any deference. The NIGC regulation, 25 C.F.R. § 502.11, discussed in the bulletin is clear and unequivocal on its face and remains controlling and in full force and effect to this day.   There is no evidence to the contrary.   Unlike promulgated regulations, NIGC bulletins are nothing more than "informal agency pronouncements" that are not formal agency actions and are not entitled to judicial deference.   *Wells Fargo Bank, Nat, Ass'n v. Lake of the Torches Econ. Dev. Corp.*, 658 F.3d 684,696 (7th Cir, 2011); *see also Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1222 (11th Cir. 2015); *Moret v. Karn*, 746 F. 2d 989, 992 (3d Cir. 1984); *Sheperd v. Merit Sys. Prot. Bd.*, 652 F.2d 1040, 1043 (D.C.Cir. 1981); and *Nader v. Bork*, 366 F. Supp. 104, 108 (D.D.C., 1973).

**b.**  **An administrative law judge in the *Dania Entertainment* case found that the Division promulgated 61D-11.002(5) to prevent cardrooms from conducting designated player games in a manner which establishes a bank.**

In his order in the *Dania Entertainment* case, Administrative Law Judge Early recognized that the purpose of the Division's promulgation of Florida Administrative Code 61D-11.002(5) was to prevent banking games.  In that case, eight cardrooms challenged the constitutionality of DBPR's proposed repeal of 61D-11.001(17) and 61D-11.002(5).  *Dania Enter. Ctr., LLC v. DBPR, Div. Pari-mutuel Wagering*, Case No. 15-7010RP, at 5 (Fla. DOAH Aug. 26, 2016) (Early, J), *appeal filed*, *DBPR v. Dania Enter. Ctr., LLC*, Case No. 1D16-4275 (Fla. 1st DCA Sep. 22, 2016); *see* Tribe's Notice Supp. Auth., ECF No. 66-1.

Judge Early found that a designated player game is a subset of traditional poker games in which a designated player plays his or her hand against each other player at the table, instead of all players competing against each other.  *Id.* ¶ 7. [17] Although the State disagrees with Judge Early's use of the term "player banked games" synonymously with "designated player games," the State agrees with Judge Early's finding that a designated player is not cardroom operator.  *Id.*

---

[17] The *Jacksonville Kennel Club* court also compared standard poker to designated player games.  Recommended Order ¶¶ 9–10, *DBPR, Div. Pari-mutuel Wagering v. Jacksonville Kennel Club*, Case No. 16-1009 (DOAH Aug. 1, 2016) (Van Wyk, J.).  Judge Van Wyk's Recommended Order is not a final order.

Judge Early also found that DBPR prohibited certain designated player games at Ebro Greyhound Park's cardroom in 2011 and the Palm Beach Kennel Club in 2012. *Id.* ¶¶ 10–12.[18]  Judge Early further found that DBPR conducted rule-making beginning in at least December 2013 until the adoption of 61D-11.002(5) on July 21, 2014. *Id.* ¶¶ 13–20.  During that rule-making process, DBPR received comments which included the identical language ultimately adopted in 61D-11.002(5), and a comment that "[m]ultiple jurisdictions have determined a key element to banked card games is the house requiring all wagers be covered. We propose this language to distinguish between lawful games and impermissible banked games." *Id.* ¶ 18.

Judge Early found that DBPR "had determined that designated player games did not violate the prohibition against 'banking games' as that term is defined in section 849.086." *Id.* ¶ 21.  Judge Early also noted that Mr. Zachem explained,

---

[18] Mr. Biegalski's testified that the Division's August 4, 2011 letter to cardroom operator Ebro Greyhound Park, Tribe Ex. 8, showed that the Division enforced the State's prohibition on banking games in 2011 when it discovered Ebro was conducting Double Hand Poker in a manner which established a bank.  Tr. 376:8–384:7.  There is no evidence to the contrary.

convincingly, that as a general rule most poker games are designated player games. *Id.* at 49 n.3.[19]

As Mr. Zachem and Dr. Jacobson testified at trial, DBPR attempted to repeal 61D-11.002(5) because cardrooms were exploiting the rule, particularly 61D-11.002(5)(a), by creating "house rules"—which are not required to be submitted to the Division with the internal controls[20]—that called for the designated player games to be played as illegal banking games, in a manner inconsistent with the internal controls submitted to the Division. Tr. 303:4–308:9; 419:3–423:16; *Dania Entertainment*, Case No. 15-7010RP at 49 n.5 (concluding that the Recommended Order in *Jacksonville Kennel Club* "was based more on the case-specific proof that

---

[19] Similarly, designated player games are poker-style games according to Mr. Kilby's testimony at trial. *See* Tr. 183:3–11. Designated player games would not meet Mr. Kilby's definition of a banked game because Mr. Kilby testified that if "you can go up to the game and the only person there is the dealer and if you can make a bet, it is a banked game. . . . the dealer represents the entity, and he pays all winners and takes all losers. That is a banked game. Let's compare that to poker. If you go up to a poker game and the only person there is the dealer, can you play? No, you can't play, because you're playing against other players." Tr. 183:3–11. If the "dealer" is the only person present at a designated player game table, there is no way for a person who approaches the table to play against the "dealer." *See* § 849.086(7)(c), Fla. Stat.

[20] Mr. Biegalski testified that cardrooms are required to include in their internal controls the "rules of gameplay," which he testified "are the rules by which the game is actually played: How the cards are dealt, how the wagers are placed . . . what the ranking of hands are in determining the winner as it relates to a poker ranking." Tr. 415:22–416:12 (citing Fla. Admin. Code R. 61D-11.019). And Mr. Biegalski testified that cardrooms are not required to submit the "house rules," which he testified "are the rules that the licensed facility itself uses in order to administer the game." *Id.*

the games conducted on that date deviated from the internal controls, and was not a sweeping conclusion that designated player games as approved constituted prohibited banking games" (citing Recommended Order in *DBPR, Div. Pari-mutuel Wagering v. Jacksonville Kennel Club*, Case No. 16-1009 (DOAH Aug. 1, 2016) (Van Wyk, J.)).

Judge Early set forth the legislative framework and the Division's rule-making authority to regulate cardrooms, including what is required to be submitted with a cardroom's internal controls. *Id.* ¶¶ 70–84. Furthermore, Judge Early made clear that the fundamental disagreement in the *Dania* case was whether the manner in which the games were being played constituted a banking game that was prohibited by section 849.086(12)(a). *Id.* ¶ 80.

Applying the rule from *St. Petersburg Kennel Club* that the Division does not have authority to set forth the definition of poker, Judge Early held that the Division's repeal of 61D-11.002(5) exceeded its rule-making authority because it was an effort to further define, prohibit, or limit poker, **an activity authorized by statute**, and the Division lacks authority to limit activities authorized by statute. *Id.* ¶¶ 96–107 (citing *St. Petersburg Kennel Club v. DBPR*, 719 So. 2d 1210, 2011 (Fla. 2d DCA 1998); *Calder Race Course, Inc. v.* DBPR, Case No. 04-2950RX (Fla. DOAH Dec. 21, 2004), *aff'd per curiam sub nom., DBPR v. Calder Race Course, Inc.*, 913 So. 2d 601 (Fla. 1st DCA 2005)).   Therefore, Judge Early

determined that that the proposed repeal of 61D-11.002(5) constituted an unconstitutional, invalid exercise of regulatory authority.[21]

### 3. The Division has taken administrative action upon discovery of designated player games conducted in a manner that "establishes a bank."

To the extent that a cardroom violates the provisions of 61D-11.002(5),[22] then it is conducting the game in a manner which establishes a bank.  The record in this proceeding demonstrates that the Division has taken administrative action against cardrooms that operated designated player games that violated the requirements of 61D-11.002(5).  Those administrative proceedings are ongoing.  The Division is fulfilling its statutory and regulatory duties within the confines of its authority in taking administrative action against cardrooms.  It has not, through any action or inaction, permitted any cardroom to offer a banking or banked card game.  Instead, it is asserting its regulatory authority to the maximum extent authorized by applicable State law, to ensure that cardrooms do not violate the prohibition against banking games.

---

[21] Although DBPR is appealing certain fact-findings and conclusions of law in the order, the facts that are referenced herein from that order are not the subject of DBPR's appeal, and those facts provide the regulatory history behind 61D-11.002(5).

[22] For a discussion of administrative actions taken before the promulgation of 61D-11.002(5), see footnote 18 *supra* and accompanying text.

To that end, the evidence established that the Division initiated sixteen administrative complaints against cardroom operators believed to be operating unauthorized card games in a banking manner in violation of § 849.086(12)(a). State Ex. 9; *see* Recommended Order in *DBPR, Div. Pari-mutuel Wagering v. Jacksonville Kennel Club*, Case No. 16-1009 (DOAH Aug. 1, 2016) (Van Wyk, J.).

The Recommended Order explains that cardroom operator Jacksonville Kennel Club began preparing to offer designated player games in the summer of 2015 and actually offered the games beginning in September 2015. *Id.* ¶¶ 11–14.[23] Jacksonville submitted its internal controls October 23, 2015, less than 90 days before the Division filed the administrative proceeding. *Id.*

The Recommended Order thoroughly explains how the internal controls required to be submitted to the Division set forth the specific "rules of gameplay" for designated player games. *See id.* ¶ 11, 15–28; *see also* footnote 20 *infra* Jacksonville submitted specific rules for one-card poker, two-card poker, three-card poker, Ultimate Texas Hold'em (also known as Florida Hold'em) and Pai Gow Poker. *Id.*[24]

---

[23] There is no evidence in this case, other than the games shut down at Ebro in 2011 and Palm Beach in 2012, that supports the Tribe's allegation that banking or banked card games were played at cardrooms before 2015.

[24] These games are the "designated player games" which the Tribe alleges are banking or banked card games.

The descriptions make clear that the "rules of gameplay" use the poker rankings of hands, that the "house" does not participate in the games, that the designated player position rotates on a hand by hand basis, and that the "house" gets paid based upon a rake.  *Id.* ¶ 11, 15–29.  Jacksonville argued that the Division's approval of its internal controls for each of the games estopped the Division from bringing the administrative complaint; however, Judge Van Wyk found that the games were not being played according to those internal controls. *Id.* ¶¶ 64–65.

The Recommended Order concluded that the Division was not estopped from filing the administrative complaint because the Division's email regarding the Jacksonville's internal controls only stated that the games "as described" in the internal controls submitted to the Division appeared to be in compliance with the Florida Statutes.  *Id.* ¶¶ 106–115.  The Recommended Order identified the issue in the case as "not whether designated-player games can be played at Jacksonville, but whether the games can be operated specifically as they were being operated at Jacksonville. The evidence does not establish that Jacksonville could not operate designated player games in a manner consistent with its approved internal controls."  *Id.* ¶ 118.  In other words, it is possible to play the designated player

games in a non-banking manner. *See id.*[25]   But Judge Van Wyk ultimately concluded that Jacksonville operated its designated player games in a banking manner. *Id.* ¶ 136.

---

[25] As the Tribe itself has recognized, even blackjack can be played in a non-banking manner. *See* State's Req. Judicial Notice App. 12, Tribe's Resp. Opp. to Pet. Writ Quo Warranto, *Fla. House Reps. v. Charlie Crist*, at 32 n.25 (Dec. 3, 2007) ("Card games, such as Black Jack, can be played in 'banked' and 'non-banked' forms. This is recognized by the National Indian Gaming Commission in a variety of circumstances.").

**D.    The operation of blackjack-themed slot machines is not permission of "banking or banked card games."**

**1.    Multi-station blackjack-themed slot machines existed in 2009.**

Multi-station blackjack-themed slot machines, also referred to as electronic table games, pre-existed the 2010 Compact.  State Exhibit 67 depicts the "Royal Match 21" model slot machine, which is the same product that pre-existed the 2010 Compact:



State Ex. 67 at 7.  Furthermore, Mr. Allen testified that Exhibit 67 depicts a slot machine he saw in the Gulfstream pari-mutuel facility.  Tr. 129:11–18.  Mr. Allen

also agreed that licensed pari-mutuels offering slot machines in Miami-Dade and Broward Counties does not violate the 2010 Compact.  Tr. 88:16–89:11.

State Exhibit 44 reflects that on November 6, 2009, Gaming Laboratories International, Inc. certified the "Royal Match 21" multi-station blackjack-themed electronic table game (pictured above) as a slot machine under Chapter 61D-14 (Pari-Mutuel Wagering Facility Slot Machine Operations).  *See* State Ex. 12.  Mr. Allen agreed that pari-mutuels were offering slot machines with table game themes prior to the 2010 Compact. Tr. 125:12–18.  Furthermore, State Exhibit 69 at 57–75 confirms that the Division concluded on October 6, 2009, prior to the 2010 Compact, that "the Machine at issue, which allows the play of blackjack-themed games via Shufflemaster's Table Master platform, meets the threshold elements for a slot machine under Florida law."  State Ex. 69 at 74.

Finally, Mr. Gordon Dickie, the Executive Director of the Seminole Tribal Gaming Commission, testified unequivocally that the Shufflemaster Table Master blackjack-themed electronic table game (pictured below) is a slot machine.  Dickie Dep. 29:6–20; 30:4–9, ECF No. 84-2 (admitted in evidence).



State Ex. 47.

### 2. Use of a live attendant does not transform blackjack-themed slot machines into "banking or banked card games."

After 2010, DigiDeal DTS-V was briefly offered in Florida in one licensed cardroom. The DTS-V model is the all virtual model. It does not use tangible playing cards, nor does it use tangible chips. Tr. 311:3–312:23; State Exs. 48–50. It has two modes, one which involves no attendant whatsoever and the second mode which involves the live attendant whose sole purpose is to push a button. LaBrocca Dep. 47:20–48:12, ECF No. 84-8; Tr. 312:5–10.

The DTS-V was certified by GLI as a slot machine under 61D-14. State Exs. 23, 24, 43. In other jurisdictions, the DTS-V has been certified by GLI as a slot machine under GLI-11 (State Exs. 17, 18).[26] *See* Tr. 311:3–312:23; 323:25–324:7; State Exs. 48–50. The DigiDeal DTS-V is not "card game". Tr. 350:4–8. Mr. Allen agreed that for a "banking or banked card game" to be a "Covered Game" under the 2010 Compact, the game must be "both banking or banked and also a card game." Tr. 85:3–7.

---

[26] Mr. Martinez, Dr. Jacobson, and GLI Vice President Richard LaBrocca all agreed that Chapter 61D-14 of the Florida Administrative Code and GLI-11 are similar standards under which the State and the Tribe have always certified their slot machines. LaBrocca Dep. 67:3–9, ECF No. 84-8; *see also* Tr. 227:9–20; 314:23–315:13.

### 3. Neither the State nor the Tribe intended for the term "banking or banked card games" to include blackjack-themed slot machines.

The evidence at trial showed that the Tribe treats blackjack-themed slot machines as slot machines and not as banking or banked card games. Tr. 123:21–23 (testifying that the Tribe marketed the games as slot machines); 124:3–5 (testifying that the Tribe accounted for the games as slot machines). Mr. Allen testified that if required to shut down "banking or banked card games" the Tribe would shut "the manual table games," and testified that "it would be my belief that that's what we were referring to when we wrote the 2010 Compact at the time." Allen Dep. 100:23–101:7, ECF No. 84-3 (admitted into evidence).

Mr. Dickie also defined banking or banked card games as games where you actually have a table bank, and you have a dealer, and you have players, and the game is banked by the house. *See* Dickie Dep. 29:6–20; 30:4–9, ECF No. 84-2.

Furthermore, the Tribe classified the blackjack-themed electronic table games as slot machines for the purposes of offering the games at all of its facilities including its Brighton facility, where Part III.F(2) of the 2010 Compact prohibits the Tribe from offering banking or banked card games. Mr. Martinez admitted that the Tribe offered a multi-station, blackjack-themed slot machine at its Brighton facility under the 2010 Compact provision permitting that game as a slot machine. Tr. 240:20–241:16 (confirming that all blackjack-themed electronic table games

manufactured by Shufflemaster, Interblock, or Bally are slot machines under the 2010 Compact).

### 4.    DBPR has enforced State law to protect the Tribe's exclusivity for slot machines.

The *Gretna Racing* matter is an example of the Division's enforcement of State law, which created and allowed the Tribe's exclusivity under the 2010 Compact.  *Gretna Racing, LLC v. DBPR*, 178 So. 3d 15 (Fla. 1st DCA 2015), *cert. granted*, SC15-1929, 2015 WL 8212827 (Fla. Dec. 1, 2015).  In *Gretna Racing*, the pari-mutuel facility sought a license to offer slot machines at its facility in Gadsden County.  *Id.* at 16–17.  The Division denied the application for the slot machine license.  *Id.*  The First District Court of Appeal upheld the Division's denial, and the case currently is pending before the Florida Supreme Court, where the Division continues to enforce State law.  *Id.*[27]

## III.   The Tribe's remedies are confined to those agreed upon in the 2010 Compact.

Even if the Court finds that the Tribe's exclusivity was breached, the remedy the Tribe seeks is contrary to the plain language of the 2010 Compact.  The Tribe has a remedy for breach of exclusivity, and that remedy is found in Part XII.A.  The Tribe has not demanded that remedy, and the Tribe stipulated that its

---

[27] This and several other cases, including the *Jacksonville Kennel Club* and *Dania Entertainment* cases discussed above, are still pending in the courts of Florida both in administrative proceedings and in the appellate courts.

obligation to make periodic Revenue Share Payments is not at issue for determination in this case. *See* Pretrial Stip. at 10, ECF No. 63. In the same section of the 2010 Compact that outlines the Tribe's remedy for loss of exclusivity, the parties expressly agreed that even a breach of the exclusivity provisions would *not* excuse the Tribe from continuing to comply with all other provisions of the 2010 Compact. *See* Part XII.D ("The breach of this Part's exclusivity provisions and the cessation of Payments pursuant to Part XI, Sections B. and D. of this Compact shall not excuse the Tribe from continuing to comply with all other provisions of this Compact . . . .").[28]

If the State "permits . . . such games" under Part XVI.B of the 2010 Compact, that provision does not provide the remedy of a fifteen-year extension of the Tribe's authorization to conduct banking or banked card games. Rather, the appropriate remedy is reflected in Part XII.A of the 2010 Compact and the case law discussed in Section II.A above. Because the parties stipulated to the exclusive remedies for breach, the Court should not accept the Tribe's invitation to devise a remedy upon which the State and the Tribe did not agree. *See Hatcher v. Panama City Nursing Ctr., Inc.*, 461 So. 2d 288, 289-90 (Fla. 1st DCA 1985)

---

[28] Jim Allen agreed that even in the case of the loss of exclusivity the Tribe is required to comply with all other terms of the 2010 Compact, including the five-year termination of the authorization for banking or banked card games. Tr. 116:5–24.

("[T]here is a general principle of law that parties to a contract may stipulate what the consequences of a breach shall be and if the stipulation is reasonable, it will control and exclude all other consequences.").[29]   However, even if this Court somehow found that (1) the Tribe's exclusivity was breached, (2) the loss of that exclusivity was the result of the State's permission of such gaming (as opposed to the result of illegal activity by a card room or pari-mutuel facility), and (3) the contractual remedy for such breach is the right to offer the permitted game, then the Tribe's remedy should be tailored in accordance with (a) the specific activity found to have been permitted, and (b) for only the duration of the time that the State permits others to conduct such gaming.

## IV.   The State has no legal obligation to renegotiate the 2010 Compact.

### A.   Eleventh Amendment and sovereign immunity bar, and regardless the Tribe did not prove, its Count II good faith claim.

The State's Eleventh Amendment and sovereign immunity bar Count II of the Tribe's complaint.   *See* State's Memo. on Immunity at 3–6, ECF No. 87. Furthermore, the Tribe's Count II is not a compulsory counterclaim.   *See id.* at 2– 3.   If the Tribe is permitted to proceed on its Count II as an affirmative cause of action or as a counterclaim, then the Court should find that the Tribe has failed to prove Count II.

---

[29] The Tribe also argued that both parties drafted the 2010 Compact and that it should not be construed in favor of either party.

The IGRA provides a claim for failure to negotiate in good faith, but such a claim expressly requires proof that a Tribal-State gaming compact has not been entered.  *See* 25 U.S.C.A. § 2710(d)(7)(B)(ii)(I).  Count II cannot survive the fact that a gaming compact exists between the parties (a fact affirmatively pled by the Tribe in its Verified Complaint).  *See* State's Mot. Partial Summ. J. at 10–15, ECF No. 38.

### B.    The 2010 Compact contains no obligation to renegotiate.

IGRA provides that Class III gaming is only legal when "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State."  25 U.S.C. § 2710(d)(1)(C). The Compact is the governing document regulating Class III gaming between the Tribe and the State.  25 U.S.C. § 2710(d)(3)(B) ("Any State and any Indian tribe may enter into a Tribal-State compact *governing* gaming activities on the Indian lands of the Indian tribe . . . ." (emphasis added)).  *See Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 383 F. Supp. 2d 123, 135–36 (D.D.C. 2005), *aff'd*, 466 F.3d 134 (D.C. Cir. 2006) (IGRA's compact provisions "confirm that Congress understood that it would be the Tribes and the States, not the federal government, who would be responsible for the regulation of Class III Indian gaming.").

Had the parties wished to include a requirement to renegotiate, they could have done so in the 2010 Compact, just as other tribes and states have done.[30]   A telling example of an unequivocal renegotiation requirement was reviewed and confirmed by the Ninth Circuit in *Rincon Band of Luiseno Mission Indians v. Schwarzenegger,* 602 F.3d 1019 (9th Cir. 2010). The Seminole Tribe relied on that case to support its assertion in this litigation that "the State's obligation to negotiate in good faith extends to renewal of expired portions of an existing compact."  Tribe's Mot. Summ J. at 24, Doc. No. 37.  In that case, in which the Rincon Band, a California Indian tribe, successfully sued the State of California for failure to negotiate in good faith,[31] the compact explicitly required renegotiation of certain compact provisions:

> Sec. 12.2. This Gaming Compact is subject to renegotiation in the event the Tribe wishes to engage in forms of Class III gaming other than those games authorized herein and requests renegotiation for that purpose, provided that no such renegotiation may be sought for 12 months following the effective date of this Gaming Compact.

Tribal-State Compact Between the State of California and the Rincon Band of Luiseno Mission Indians, 65 Fed. Reg. 31189 (May 16, 2000).

---

[30] Mr. Allen testified to his unsuccessful efforts to include a provision in the 2010 Compact that required the parties to renegotiate at the end of five years.  Tr. 132:3–18.

[31] Unlike the State of Florida, California has waived its immunity to tribal suits alleging failure to negotiate in good faith.

This provision unmistakably provides for renegotiation and defines in detail (along with the subsequent provision) (1) the process for renegotiation, (2) the timing of renegotiation, and (3) the limited provisions subject to renegotiation. *Id.*

In stark contrast to the Rincon Compact, the 2010 Compact does not require renegotiation, does not set out the timing or process for renegotiation, and does not enumerate those provisions which would be subject to renegotiation.

## V.     The State negotiated in good faith.

The State and the Tribe conducted a mediation process intended to avoid this lawsuit at the same time as a separate negotiation for either an amendment to the 2010 Compact or an entirely new compact.  This voluntary negotiation was a separate, distinct process.  The State's negotiation team included key members of the Executive Office of the Governor, committee chairpersons of both houses of the Florida Legislature responsible for gaming, as well as representatives from DBPR.  Tr. 60:1–66:21; 67:9–71:11; 126:16–129:10; 392:20–393:10.

That good faith negotiation was partially successful. The Governor and the Tribe reached agreement on a new compact and in fact signed it in December 2015.  The Governor encouraged the Legislature to approve the new compact. Several bills that would have included approval of the new compact were voted on and passed through both substantive committees.  The evidence absolutely showed

that the State negotiated in good faith in both the mediation process and the separate negotiation.  Tr. 60:1–66:21; 67:9–71:11; 126:16–129:10; 392:20–393:10.

## VI.   Conclusion

For the reasons stated herein, the State requests that the Court enter an order granting final judgment: (a) against the Tribe on Counts I and II of its Verified Complaint; and (b) in favor of the State on Count I and II of its Complaint.

Dated:  October 14, 2016                  Respectfully submitted,

Jason Maine
Florida Bar No. 091833
General Counsel
Department of Business and Professional Regulation
2601 Blair Stone Road
Tallahassee, Florida 32399
Telephone: (850) 717-1241
Facsimile: (850) 922-1278
jason.maine@myfloridalicense.com

William N. Spicola
Florida Bar No. 0070732
General Counsel
Executive Office of the Governor
William.Spicola@eog.myflorida.com
*Counsel for Defendant*

*/s/ J. Carter Andersen*
J. Carter Andersen, Esq.
Florida Bar No. 0143626
candersen@bushross.com
Anne-Leigh Gaylord Moe, Esq.
Florida Bar No. 018409
amoe@bushross.com
BUSH ROSS, P.A.
1801 North Highland Avenue
P.O. Box 3913
Tampa, Florida  33601-3913
Telephone: (813) 224-9255
Fax: (813) 223-9620
*Local Counsel for Defendant*

*OF COUNSEL*:
Robert W. Stocker II, Esq.
MI Bar No.: P21040
DICKINSON WRIGHT PLLC
215 S. Washington Square - Suite 200
Lansing MI 48933
Telephone: (517) 487-4715
Facsimile: (517) 487-4700
rstocker@dickinsonwright.com

Dennis J. Whittlesey, Esq.
DC Bar No.: 053322
dwhittlesey@dickinsonwright.com
Patrick M. Sullivan, Esq.
DC Bar No.: 1018119
psullivan@dickinsonwright.com
DICKINSON WRIGHT PLLC
1825 Eye St, N.W. - Suite 900
Washington, D.C.  20006
Telephone: (202) 659-6928
Facsimile: (202) 659-1559
*Pro Hac Vice Counsel for Defendant*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on October 14, 2016, the foregoing was filed electronically with the Clerk of the United States District Court for the Northern District of Florida using the CM/ECF system which will send a notice of electronical filing to the following parties:

> Barry Richard, Esquire
> Greenberg Traurig, P.A.
> 101 East College Avenue
> Tallahassee, FL  32301
> Email: richardb@gtlaw.com;
> trammellc@gtlaw.com
> flservice@gtlaw.com

> Joseph H. Webster, Esquire
> Hobbs Straus Dean & Walker, LLP
> 2120 L Street, N.W., Suite 700
> Washington, D.C.  20037
> Email: jwebster@hobbsstraus.com

*/s/ J. Carter Andersen*
Attorney