**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

SEMINOLE TRIBE OF FLORIDA,

      Plaintiff,

                              CONSOLIDATED

v.                               CASE NO.  4:15cv516-RH/CAS

STATE OF FLORIDA,

      Defendant.

_____/

**<u>OPINION ON THE MERITS</u>**

The Seminole Tribe of Florida operates casinos under a Compact entered into with the State of Florida under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721 ("IGRA"). The Compact became effective in 2010 and has a 20-year term. The Compact authorizes the Tribe to conduct banked card games—blackjack, for example—only during the first five years. That period has now ended. But there is an exception to the five-year limitation. The limitation does not apply—the Tribe may continue to conduct banked card games for the entire 20-year term— if "the State permits any other person [except another tribe] to conduct such games."

The Tribe and the State have filed lawsuits against one another that have

been consolidated. The cases present two central issues: whether the exception to the five-year limitation has been triggered; and whether the State has breached a duty under IGRA to negotiate in good faith for a modification of the Compact.

This order sets out the court's findings of fact and conclusions of law following a bench trial. The order declares that the exception has been triggered— that the Tribe may conduct banked card games for the Compact's 20-year term. The order awards no further relief on the failure-to-negotiate claim.

I

The Tribe filed the first of these cases against the State in this district, asserting, in count one, that the Tribe has authority to conduct banked card games for the Compact's full 20-year term. The Tribe asserts, in count two, that the State has breached its duty to negotiate with the Tribe in good faith.

The State filed the second of these cases four days later against the Tribe in the Middle District of Florida, asserting that the Tribe is improperly continuing to conduct banked card games. In count one, the State asserts the Tribe's conduct of banked card games violates the Compact, and in count two, the State asserts the Tribe's conduct of the games violates IGRA (because IGRA allows a tribe to conduct gaming of this kind only if authorized by the state where the gaming will occur). The Middle District transferred the State's case here, where it was consolidated with the Tribe's case.

The State asserted Eleventh Amendment and sovereign immunity from the Tribe's count two. In response, the Tribe asserted that the State waived its immunity by filing its own lawsuit. That led the State to announce, at the outset of the trial, that it wished to voluntarily dismiss its count two, rather than suffer a waiver. This order grants the voluntary dismissal, which, in light of the ruling on the merits, makes no difference anyway.

## II

Indian tribes have their own sovereignty. Even so, Congress can adopt laws governing conduct on Indian lands. IGRA is such a law.

IGRA gives a tribe "exclusive jurisdiction" on its Indian lands over some forms of gaming—denominated "class I." 25 U.S.C. § 2710(a). Class I gaming includes social games played for prizes of minimal value or traditional Indian gaming that is part of a tribal ceremony or celebration. *Id.* § 2703(6). Class I gaming is not at issue here.

IGRA allows a tribe to conduct "class II" gaming on its Indian lands if the state where the lands are located allows anyone else to conduct such gaming. *Id.* § 2710(b)(1). Bingo is an example of a class II game. *Id.* § 2703(7)(A)(i). So is a card game such as traditional poker. *See id.* § 2703(7)(A)(ii). But class II does not include "banking card games, including baccarat, chemin de fer, or blackjack (21)," *id.* § 2703(7)(B)(i), or "slot machines of any kind," *id.* § 2703(7)(B)(ii).

Class III includes any form of gaming not included in class I or II. *Id.* § 2703(8). "Slot machines" and "banking card games"—the kind of gaming at issue in this case—thus are within class III. IGRA allows a tribe to conduct class III gaming on its Indian lands only if the state where the lands are located enters into a compact with the tribe allowing it to conduct such gaming.

Under this framework, a state can prohibit or regulate class III gaming on Indian lands, so long as it similarly prohibits or regulates gaming by others. *See id.* § 2710(d)(1)(B). But a state's authority over gaming on Indian lands is not unlimited. IGRA obligates a state to negotiate with a tribe on this subject in good faith. *Id.* § 2710(d)(3)(A). And IGRA imposes limits on a state's ability to exact payments from a tribe for allowing gaming. *See id.* § 2710(d)(3)(C). Payments can be made only if supported by a benefit the state confers on the tribe. *See, e.g.*, *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1033 (9th Cir. 2010) (*quoting In re Indian Gaming Related Cases*, 331 F.3d 1094 (9th Cir. 2003)).

III

Acting under this framework, the State of Florida and the Seminole Tribe of Florida entered into a gaming compact ("the Compact") in 2010. Under the Compact, "the Tribe is authorized to operate Covered Games on its Indian lands, as defined in the Indian Gaming Regulatory Act, in accordance with the provisions

of this Compact." State's Ex. 1 ("*Compact*") at § IV.A. The Compact defines "Covered Games" to include "Banking or banked card games, including baccarat, chemin de fer, and blackjack (21)," with an exception for two locations.

For this purpose the words "banking" and "banked" are synonyms. There is no difference in the meaning ascribed to these terms in the gaming industry, in relevant legal authorities, or in the Compact. Instead, the Compact uses the terms as alternative references to the same thing, much as one might say the number of eggs in a carton is usually "a dozen or 12." For convenience, this order ordinarily refers only to "banked" games, not "banking or banked" games, except when quoting.

Florida law allows gaming under compacts with Indian tribes and in limited other circumstances. Under Florida Statutes § 849.086, licensed parimutuel facilities may operate cardrooms, but the statute explicitly forbids "banking" card games. Fla. Stat. § 849.086(12)(a).

Because of this statute, the Tribe's authority under the Compact to conduct banked card games afforded the Tribe the right to conduct banked card games *without competition from cardrooms*. This was perhaps the most important benefit the Tribe obtained under the Compact. The most important benefit to the State was more than a billion dollars. Because IGRA prohibits a state from receiving a share of a tribe's gaming revenue except to defray expenses or in exchange for a benefit

conferred on the tribe, the Tribe's billion-dollars-plus payments to the State under the Compact were justified in large part as compensation for the exclusive right to conduct banked card games—exclusive, that is, except for any competition from other tribes or other types of games.

The term of the Compact is 20 years, but there is a five-year limitation for banked card games, subject to two exceptions:

> This Compact shall have a term of twenty (20) years (240 months) beginning on the first day of the month following the month in which the Compact becomes effective under Section A of this Part; provided, however, that the authorization for the Tribe to conduct banking or banked card games as defined in Part III, Section F(2) shall terminate on the last day of the sixtieth (60th) month after this Compact becomes effective unless [1] the authorization to conduct such games is renewed by the parties or [2] *the State permits any other person, organization or entity*, except for any other federally recognized tribe pursuant to Indian Gaming Regulatory Act, provided that the tribe has land in federal trust in the State as of February 1, 2010, *to conduct such games*.

*Compact* § XVI.B. (bracketing and emphasis added).

The five-year period ended in 2015. The "authorization to conduct such games" has not been "renewed by the parties," so the first exception to the five-year limitation does not apply. The Tribe has continuing authority to conduct banked card games only if the second exception applies, that is, only if the State has "permit[ted] any other person," not including another Indian tribe, "to conduct such games." For convenience, this order uses "person" to include an "organization or entity." *Cf.* Fla. Stat. § 1.01(3) (similarly defining "person").

The Tribe says the State has permitted others to conduct two kinds of banked card games: games in which a designated player (rather than a facility or facility employee) acts as the bank; and games played with electronic cards. The State denies that these are banked card games.

The critical issue is the proper construction of "banking or banked card games" as that term is used in the Compact's § XVI.B. The term is sufficiently ambiguous on its face to allow parol evidence, including evidence of the usage in the industry. *See, e.g.*, *Hinote v. Brigman*, 44 Fla. 589, 33 So. 303 (Fla. 1902) (construing a contract for "saw logs" based on evidence of the "well-understood meaning among those habitually dealing in that commodity"); *In re Gulf Coast Orthopedic Center, Inc.*, 297 B.R. 865, 869 (Bankr. M.D. Fla. 2003) (citing *Carr v. Stockton*, 84 Fla. 69, 92 So. 814 (Fla. 1922)); 17A AM. JUR. 2D *Contracts* § 353 (2016) (collecting cases) ("[W]ords connected with a particular or peculiar trade are to be given the signification attached to them by experts in such art or trade . . . [and] [t]echnical words are to be interpreted as usually understood by persons in the profession or business to which they relate. . . ."). In addition, parties ordinarily are presumed to contemplate existing law when they enter into a contract. *See, e.g.*, *Belcher v. Belcher*, 271 So. 2d 7, 9 (Fla. 1972); *Southern Crane Rentals, Inc. v. City of Gainesville*, 429 So. 2d 771, 773 (Fla. 1st DCA 1983).

# IV

Card games can be categorized in an infinite number of ways. For present purposes, games are properly divided into two categories: those in which the players play against each other, and those in which the players play not against each other but against a bank. An example in the first category is traditional poker. A common pot is funded by the players, with the winnings paid from the pot. It is a zero-sum game, with winnings equal to losses, subject only to any rake paid to the facility. An example in the second category is traditional blackjack. It is not a zero-sum game. On any given deal, all players can win, or all players can lose, or there can be both winners and losers. There is no common pot. The essential feature of a "banked" game is this: the bank pays the winners and collects from the losers.

This understanding of a "banked" game accords with the Compact, IGRA, the Florida statute defining this term, industry usage, ordinary English, and the parties' intent.

## A

Under the Compact (as quoted above), the five-year limitation applies to "banking or banked card games as defined in Part III, Section F(2)." Section F(2) provides in full: "Banking or banked card games, including baccarat, chemin de fer, and blackjack (21); provided, that the Tribe shall not offer such games at its Brighton or Big Cypress Facilities unless and until the State of Florida permits any

other person, organization or entity to offer such games." *Compact* § III.F.2. That

definition closely tracks IGRA. *See* 25 U.S.C. § 2703(7)(B)(i) (excluding from

class II gaming—and thus including in class III—"banking card games, including

baccarat, chemin de fer, or blackjack (21)").

Baccarat, chemin de fer, and blackjack are all games in which there is no

common pot, the players do not compete against one another, and instead a bank

pays the winners and collects from the losers. In baccarat and blackjack, the bank

is most often a dealer employed by the facility—in effect, the facility itself,

commonly denominated the "house." In chemin de fer, the bank is always one of

the players. This makes clear that, under the Compact and IGRA, banked games

include both house-banked games and player-banked games.

In asserting the contrary, the State says chemin de fer is rare to the point of

nonexistent—no longer played in this country and rarely played elsewhere. But

IGRA and the Compact refer to this game. And the reference is fully consistent

with what would be true anyway: banked card games include games banked by the

house or by someone else, including a player. That Congress and then the parties

reached back to an antiquated game to find an unmistakable example of a player-

banked game makes it more clear, not less, that they intended the Compact's

reference to banked games to include player-banked games. There is absolutely no

basis for the State's apparent position that this was just a mistake by those

involved in drafting IGRA or by the representatives of the State and the Tribe who drafted the Compact. Quite the contrary.

I find that the Tribe was represented in the negotiations by individuals with long experience in this industry who well understood the terms they used. The reference to chemin de fer was not a mistake.

## B

Along the same lines, a Florida statute defines a "banking game" as "a game in which [1] the house is a participant in the game, taking on players, paying winners, and collecting from losers or [2] in which the cardroom establishes a bank against which participants play." Fla. Stat. § 849.086(2)(b) (bracketing added). The first part of the definition—the part following the bracketed [1]—describes a house-banked game, that is, a game played in the manner that is typical for blackjack and baccarat, two of the examples listed in the Compact and IGRA. The second part of the definition—the part following the bracketed [2]—describes a game banked by anyone else, including a player, that is, a game played in the manner of chemin de fer, the other example listed in the Compact and IGRA.

The State says, though, that when a player acts as the bank, the cardroom does not "establish" the bank within the meaning of § 849.086(2)(b). Not so. When the cardroom devises and runs the game and sets the rules, including the requirement that a player act as the bank, the cardroom "establishes" a bank. Any

notion that players just happen in off the street and decide on their own to establish a bank is wholly fanciful.

This understanding of § 849.086(2)(b) comports with the entire purpose of distinguishing banked games (those with a bank) from unbanked games (those in which the players compete against each other for the proceeds of a common pot). The statute's preamble makes this clear: "The legislature finds that authorized games [that is, games allowed in parimutuel cardrooms] are considered to be pari-mutuel style games and not casino gaming *because the participants play against each other* instead of against the house." Fla. Stat. § 849.086(1) (emphasis added). This recognizes that, as set out above, there are two relevant categories of card games: banked and unbanked. And while the quoted sentence also refers to the "house," this is understandable shorthand given the predominance at that time of games in which the bank was the house. The statute's later definition of a banked game to include games in which the bank is *not* the house—games described in bracketed clause [2] as quoted above—makes clear that the bank need not be the house.

In sum, nothing in this or any other Florida statute suggests that a game is not "banked" when the bank is a player rather than the house.

## C

The accepted usage in the industry is the same: a banked game is one in

which there is no common pot but instead there is a bank who pays the winners and collects from the losers. Under the accepted industry usage, a game with a bank is a banked game, whether the bank is the house, a third party, or a player. The Tribe's expert, whose testimony on this I credit, so testified. I do not credit the testimony of the State's expert, who said, in effect, that the term "banked" has no meaning within the industry and instead can be understood only by reference to a given jurisdiction's laws. And for what it's worth—not much—the State's expert misinterpreted Florida law.

## D

This definition also accords with ordinary English. A "poisoned apple" is a "poisoned apple," whether poisoned with arsenic, hemlock, or something else. A "banked game" is a "banked game," whether banked by the house, a player, or someone else. The State has suggested no meaning of the term "bank" that works in this context other than the term's obvious meaning: the person who pays the winners and collects from the losers. Thus a "banked game," as a matter of ordinary English, is a game in which someone, that is, a "bank," pays the winners and collects from the losers.

## E

Finally, this was also the understanding of the Tribe and the State when they entered into the Compact. The Tribe agreed to pay more than a billion dollars to

the State, primarily for the right to provide banked card games without competition from the cardrooms or others, save only other tribes. The Tribe certainly did not intend this exclusive right to be easily evaded.

The most important practical significance of the distinction between banked and unbanked games is perhaps this. Many prospective gaming customers are willing to compete on a given hand against the bank, even knowing the bank has a mathematical advantage. But a substantial subset of those prospective customers are unwilling to compete on a given hand against other players—players of unknown but quite possibly superior ability. And in any event, the nature of the game one is playing is substantially different when one is competing against a bank or, in contrast, against other players.

When the Tribe and the State entered into the Compact, the cardrooms were not in the running for the subset of players unwilling to compete on a given hand against other players. The Tribe's understanding at that time—and almost surely the State's—was that cardrooms could not provide that kind of game. The Tribe paid an enormous sum for the right to serve the subset, free from cardroom competition. When the cardrooms later set up designated-player games, they were able to compete for players in the subset—players who did not wish to match skills with other players on a given hand. The Tribe would not have entered the Compact on these terms had it known this would be allowed.

In sum, the parties' understanding, when they entered into the Compact, was that the term "banking or banked games" included both house-banked and player-banked games. This included games later offered as "designated player" games.

V

In a prototypical banked game—blackjack, for example—the proprietor of the facility employs the dealer, who acts as the bank. The dealer has an advantage under the rules of the game, and so, in the long run, the facility makes money. The facility has no inherent incentive to allow anyone else to act as the dealer. But if the governing law prohibits a facility from offering banked games, the facility can attempt to evade the prohibition by arranging for or allowing another person or entity to become the bank, and asserting that the resulting game is somehow not a banked game. The substitute bank can be a person who is ostensibly a player in the game and who may or may not have an arrangement with the facility.

Florida parimutuel cardrooms embarked on this course in 2011, not long after the Tribe and the State entered into the Compact. The Legislature has delegated the task of regulating cardrooms to the Department of Business and Professional Regulation, which proudly touts its excellent relationship with all its regulated entities. *See* ECF No. 99 at 54. The Department allowed the cardrooms to conduct their player-banked games and indeed advised the cardrooms in writing that their

games complied with Florida law. *See* Tribe's Ex. 20 (e-mail from DBPR to Miami Jai-Alai Cardroom); Tribe's Ex. 21 (e-mail from DBPR to Tampa Bay Downs); Tribe's Ex. 52 (e-mail from DBPR to Daytona Beach Kennel Club). The Tribe raised objections in its quarterly meetings with the Department but did not vigorously press the issue because it wished to maintain its own excellent relationship with the Department and knew that negotiations to extend the five-year limitation and to modify the Compact in other respects would soon be underway.

A particularly egregious example of the cardrooms' attempt to evade the prohibition on banked card games was a cardroom's game providing for a "player" to act as the bank but requiring the "player" to pass a background check and post a cash bond of $100,000. *See* Tribe's Ex. 51. The assertion that this game was just players competing against one another, without a "bank" established by the facility, should have been a nonstarter. But the Department assured the cardroom in writing that the game was compliant with Florida law. The assurance provided a "safe harbor," protecting the facility from prosecution for conducting an illegal banked game. ECF No. 99 at 5-6.

The Department's designated representative at trial testified that the person who gave the assurance may have been acting outside the scope of her authority— in the nomenclature of tort law, on a "frolic." ECF No. 99 at 50. The assertion is

incorrect. The assurance was consistent with Department policy allowing player-banked games. And in any event, the employee was performing precisely the task the Department had delegated to her. She was acting within the course and scope of her authority for the Department.

Doubling down on its policy of allowing parimutuel facilities to conduct player-banked games, but perhaps recognizing that the games as conducted were a rather obvious evasion of the law, the Department adopted a rule explicitly allowing and regulating the practice. Florida Administrative Code Rule 61d-11.002(5) took effect on July 21, 2014. The rule allows parimutuel cardroom games "with a designated player that covers other players' wagers"—a player bank—so long as the cardroom meets three conditions.

First, the cardroom must "[e]stablish uniform requirements to be a designated player." Fla. Admin. Code R. 61D-11.002(5)(a). By its terms, the provision would allow a uniform requirement that every "designated player" undergo a background check and post a $100,000 bond, or that every "designated player" meet other terms that a typical player walking in off the street could not or would not wish to meet. The condition thus would allow a cardroom to ensure that, from the viewpoint of a typical player, the "designated player" would be indistinguishable from the house.

Second, using the cardrooms' nomenclature, under which a "dealer button"

identifies the "designated player" for any given hand, the rule requires a cardroom to "[e]nsure that the dealer button rotates around the card table in a clockwise fashion on a hand by hand basis to provide each player desiring to be the designated player an equal opportunity to participate as the designated player." *Id.*, R. 61D-11.002(5)(b). The theory is that if every player takes a turn as the bank, the game becomes more like players competing against one another, as they do, for example, in traditional poker. But when there is a bank, in each hand each player is still playing against the bank, not against the other players as in traditional poker; it is still a banked game. Moreover, to act as the designated player or bank, a player still must meet the cardroom's uniform requirements, which, as set out above, may as a practical matter limit a player from taking on the role of bank. And many players will not wish to act as the bank, even if given the "opportunity" to do so. A designated-player game is attractive to participants precisely to the extent it mirrors a traditional banked game—precisely to the extent that players are allowed to play against the bank without competing against other players, who may be more skilled.

Third, the cardroom must "[n]ot require the designated player to cover all potential wagers." *Id.*, R. 61D-11.002(5)(c). This is window dressing of no practical import. Even in a traditional house-banked game, the house is not required to cover all potential wagers; the house can and typically does set a limit

on the amount a player can wager. And in the unlikely event that an actual player in the game elected to act as the bank but then refused to accept individual wagers below the limit, the effect would be simply that some players would not play that hand (or would wager only any lower amount still available from the "designated player's" allotment). For those who were able to play, this would not change the nature of the game from banked to nonbanked. The players whose wagers were covered would still play only against the bank, not against other players, and the bank would still pay winners and collect from losers. Those unable to play that hand would simply sit out the hand—much as if they went to the restroom.

Nothing in the Compact, IGRA, or Florida law suggests that these three conditions somehow change a player-banked game into a nonbanked game. Nor can the plain-language meaning of "banked" somehow support the assertion that a player-banked game is "banked" when it does *not* meet these conditions but nonbanked when it *does* meet these conditions. Perhaps most importantly, when they entered into the Compact, the parties did not believe a game that meets these conditions would somehow be deemed nonbanked. A player-banked game that meets these conditions, like one that does not, is still a banked game.

Probably in response to the Tribe's insistence that the State's approval of these games has abrogated the five-year limitation on the Tribe's own conduct of banked games, the Department has proposed to repeal this rule. *See* Notice of

Proposed Rule, 41 Fla. Admin. Reg. 5112 (Oct. 29, 2015). But in the consolidated cases now before this court, the State has explicitly asserted that the rule is valid and remains in effect. The Department continues to allow parimutuel cardrooms to conduct banked games so long as they comply with the rule.

In sum, the history is this. There were no player-banked games at parimutuel cardrooms when the parties entered into the Compact. The parties did not expect the Tribe to have to compete against such games. But the Department permitted cardrooms to conduct banked games as early as 2011, formally approved the practice by adopting a rule in 2014, continues to permit the games, and asserts the rule is valid today. This has triggered the Compact's explicit exception to the five-year limitation on the Tribe's conduct of banked card games. The Compact allows the Tribe to conduct banked card games for the Compact's full 20-year term.

## VI

In reaching this conclusion, I have not overlooked the State's insistence that only the Florida Legislature, through a duly enacted statute, may authorize gaming. No statute authorizes parimutuel cardrooms to conduct banked card games. Instead, Florida Statutes § 849.086(12)(a) prohibits the practice.

The statute authorizes the Department of Business and Professional Regulation to adopt rules that "regulate the operation of cardrooms." *Id.* § 849.086(4). But Florida construes grants of rulemaking authority much more

narrowly than most jurisdictions. *See* Fla. Stat. § 120.536; *see also Dep't of Bus. & Prof'l Regulation v. Calder Race Course, Inc.*, 23 Fla. L. Weekly D1795 (Fla. 1st DCA July 29, 1988). One court has held that the Department may not adopt rules defining what is or is not a banked game within the meaning of § 849.086. *See St. Petersburg Kennel Club v. Dep't of Bus. & Prof'l Regulation*, 719 So. 2d 1210 (Fla. 2d DCA 1998); *see also Dania Entertainment Center, LLC v. DBPR, Div. Pari-mutuel Wagering*, Case No. 15-7010RP, at 43-44 (Fla. DOAH August 26, 2016), *appeal filed, DBPR v. Dania Enter. Ctr., LLC*, Case No. 1D16-4275 (Fla. 1st DCA Sep. 22, 2016); *DBPR, Div. Pari-mutuel Wagering v. Jacksonville Kennel Club, Inc.*, Case No. 16-1009, 38-42 (Fla. DOAH August 1, 2016). I assume without deciding that, as suggested by these authorities, the Department's rule authorizing player-banked games, Florida Administrative Code Rule 61D-11.002(5), is invalid.

This does not change the result. The issue in this litigation is not whether the rule is valid. The issue is the meaning of the Compact's exception to the five-year limitation on the Tribe's conduct of banked card games. The exception applies if the State "permits any other person . . . to conduct such games." It is inconceivable that the parties meant that the State, through the officials to whom it delegated the authority to regulate cardrooms, could allow cardrooms to conduct banked games, issue written assurances that the games comply with state law,

adopt a rule approving the practice, but then assert that the exception was not triggered because the Legislature itself had not taken the action. The most reasonable construction of the Compact's language—and the understanding of both sides in entering into the Compact—was that the five-year limitation would not apply if the State, through its regulators, permitted cardrooms or others (excluding only other Indian tribes) to conduct banked card games.

In arguing the contrary, the State relies on cases arising in other contexts that say nothing about the proper construction of this Compact. *See, e.g.*, *California v. Cabazon Bank of Mission Indians*, 480 U.S. 202 (1987) (addressing the meaning of a statute that predated IGRA and allowed six states to apply their criminal laws to conduct on Indian lands); *Seminole Tribe of Fla. v. Fla.*, 1993 WL 475999 (S.D. Fla. Sept. 22, 1993) (recognizing that a statute is not repealed merely by nonuse), *effectively vacated for lack of jurisdiction*, *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44 (1996). These cases and others cited by the State cast not the slightest doubt on the rather obvious proposition that a state agency's affirmative act— including the agency's formal adoption of a rule—constitutes an act of the state.

This ruling does not mean that the Tribe can conduct gaming the Legislature did not authorize. The Legislature duly enacted a statute approving the Compact. The Compact authorized the Tribe to conduct banked card games—for five years or 20, depending on future events. If, as now has occurred, the State, through the

Department of Business and Professional Regulation, permitted others to conduct banked card games, the Compact authorized the Tribe to conduct banked card games for 20 years. By approving the Compact, the Legislature authorized the Tribe to conduct banked card games for 20 years.

## VII

I also have not overlooked the State's reliance on a different provision of the Compact. The language that is critical to this decision is in § XVI.B.: the five-year limitation on banked card games does not apply if "the State permits any other person . . . to conduct such games." The State says, in effect, that this language should be wholly ignored—that it has no meaning whatsoever—because of Part XII. The assertion contravenes an accepted canon of construction: contractual language ordinarily should not be stripped of all meaning. *See, e.g.*, *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 64 (1995) ("[A] document should be read to give effect to all its provisions and to render them consistent with each other."). More importantly, Part XII will not bear the meaning the State ascribes to it.

Part XII addresses the Tribe's required payments to the State. The subject is not just banked card games but any kind of class III or casino-style gaming, including, for example, slot machines, subject to limited exceptions. Part XII provides that if a Florida statute or constitutional amendment allows class III or

other casino-style gaming that was not authorized as of February 1, 2010, the Tribe's required payments to the State will be reduced. Part XII does not address in any way the Tribe's own ability to conduct gaming of any kind.

The obvious scope and purpose of Part XII can be illustrated by a plausible hypothetical—a hypothetical of the kind the parties surely envisioned when they entered into the Compact. Suppose in 2020 a constitutional amendment authorizes slot machines statewide. It could happen. Under Part XII, this would reduce the Tribe's required payments to the State, but it would not terminate the Tribe's own ability to provide slot machines. The provision makes sense; the loss of exclusivity would reduce the value of the Tribe's ability to conduct its own gaming. Similarly, a loss of exclusivity for banked card games would reduce the required payments but would have nothing to do with the Tribe's own ability to conduct banked card games.

Part XII does not speak to the issue in this case: whether the Tribe may conduct banked card games for five years or 20. Instead, § XVI.B. speaks to that issue and is controlling.

VIII

One other provision of the Compact, § XVI.C., deserves mention.

As background, recall that under § XVI.B., there are two exceptions to the five-year limitation on the Tribe's authority to conduct banked card games: the

Tribe may continue to provide such games if the authority to do so is "renewed by the parties" or if "the State permits any other person . . . to conduct such games."

The very next section, XVI.C., includes this provision: "The Tribe's authorization to offer banked or banking card games shall automatically terminate five (5) years from the Effective Date unless renewed by affirmative act of the Florida Legislature." Standing alone—considered without regard to XVI.B.—this language does not recognize the exception that applies when the State permits another person to conduct such games.

The presence of these two apparently inconsistent provisions in such close proximity to one another is curious. Two things are noteworthy about the drafting.

First, XVI.B. refers to "the State," while XVI.C. refers to the "Florida Legislature." The parties used different terms and apparently meant different things; they apparently recognized that "the State" can act not just through the Legislature but in other ways. This supports the conclusion that when the Department of Business and Professional Regulation permitted parimutuel cardrooms to conduct banked card games and adopted a rule formally approving the practice, "the State" permitted the cardrooms to conduct such games, within the meaning of XVI.B. And this further supports the conclusion that XVI.B. and XVI.C. are not mirror images; XVI.B. is broader.

Second, as both sides have agreed, the Compact was drafted by both parties,

with one side initially drafting some provisions and the other side initially drafting other provisions. The record includes no evidence on who initially drafted XVI.B. or XVI.C., but a good guess is that there were different authors.

The best reading of these provisions is this. There are two exceptions to the five-year limitation on the Tribe's ability to conduct banked card games. One exception, recognized in XVI.B. and clarified in XVI.C., is that the Tribe's ability to conduct such games can be "renewed" by the parties—that is, by the Tribe and the Florida Legislature. The word "renewed" is in both XVI.B. and XVI.C, and while XVI.B. refers only to the "parties," it is uncontested that any renewal could be approved only by the Legislature, as XVI.C. makes clear.

The second exception, set out only in XVI.B., is triggered when "the *State* permits any other person [except another tribe] to conduct such games." The parties did not limit this to action of the Legislature. And even though XVI.C. does not again set out this exception, it is clearly included in XVI.B. The parties knew the provision was there and intended it to be part of the Compact. It cannot be read out of existence.

## IX

The conclusion that player-banked card games are banked card games, thus triggering the exception to the five-year limitation on the Tribe's conduct of banked card games, makes it unnecessary to determine whether electronic

blackjack is also a banked card game. The issue is close—too close to resolve when a ruling is not essential to the outcome of the case. This order briefly explains this conclusion but expresses no opinion on how the issue would be resolved.

Slot machines—or at least the slot machines at issue—are "banked" games, because the player plays against the bank. Indeed, the machines are house-banked games, because the player plays against the house. The issue is not whether electronic blackjack is a *banked* game, but whether electronic blackjack is a *card* game. This is so because the exception to the five-year limitation applies when the State permits others to conduct banked "card games."

The State says all of the electronic blackjack games at issue are slot machines, approved by the State under its protocols for slot machines. That is correct. The State also says a slot machine can never be a card game, because the categories are mutually exclusive. But nothing in Florida law or logic suggests that the categories must be mutually exclusive.

To be sure, a blackjack-themed slot machine of the kind in use in Florida when the Compact was entered into—a game with a single player sitting at a machine with no human attendant—was much more like a traditional slot machine than like a card game. Calling such a machine a card game would be a stretch. This does not mean, though, that an electronic blackjack game can *never* be a card

game.

This is not the first industry in which the digital age has changed how things are done. The courts are an example. Materials that were traditionally presented on paper are now commonly presented electronically. Apparently without exception, courts have held that the statutes and rules that were written for paper materials are fully applicable to electronic versions. *See, e.g.*, Fed. R. Evid. 101(b)(6) (adopting, as part of the restyling project that made no substantive changes, this provision: "a reference to any kind of written material or any other medium includes electronically stored information").

There is no apparent reason why the same approach should not apply to the gaming industry. As individuals become ever more accustomed to electronic innovations, it is not hard to imagine a world in which playing cards are more often electronic than physical—in which cards in traditional form go the way of telephone dials and vinyl records. Even so, no blackjack game has yet been played in Florida in which the *only* change is from a physical card to an electronic card. Nor does the record show that *the State* has permitted every version of electronic blackjack that has been played in the State.

A ruling for the Tribe on this issue would provide an alternative basis for the holding that the exception to the five-year limitation has been triggered. But the issue is too close to be resolved in a case in which a ruling is not essential to the

outcome.

## X

A tribe that proposes to conduct class III gaming on its lands must "request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities." 25 U.S.C. § 2710(d)(3)(A). The provision continues: "Upon receiving such a request, *the State shall negotiate with the Indian tribe in good faith* to enter into such a compact." *Id.* (emphasis added). The Tribe's count two seeks to enforce this requirement. The State says it has Eleventh Amendment and sovereign immunity from the claim.

## A

By its terms, IGRA establishes a procedure under which a tribe may enforce the state's duty to negotiate in good faith. The enforcement mechanism begins with a lawsuit against the state in district court. But a state retains its Eleventh Amendment and sovereign immunity from such a lawsuit. *See, e.g.*, *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) (holding that a state has Eleventh Amendment immunity from a tribe's IGRA action to enforce the duty to negotiate in good faith); *Alden v. Maine*, 527 U.S. 706 (1999) (recognizing the federal constitutional basis for a state's sovereign immunity separate and apart from the Eleventh Amendment).

The Compact includes an explicit waiver of the State's immunity for "disputes between the State and the Tribe that arise under this Compact," so long as "the dispute is limited solely to issues arising under this Compact." *Compact* § XIII.D. The limitation to "issues arising under this Compact" means that a court's ability to resolve a dispute arising under the Compact does not bring with it the authority to resolve an ancillary dispute that does *not* arise under the Compact.

The State acknowledges that the waiver is valid and applies to the Tribe's count one—the claim asserting the Tribe's right under the Compact to conduct banked card games. The State says, though, that the waiver does not reach the Tribe's count two, which seeks to enforce the State's duty to negotiate in good faith.

The Compact does not, by its terms, obligate the State to negotiate for an extension of the five-year limitation or for any other modification of the Compact. The Tribe's failure-to-negotiate claim thus does not "arise under" the Compact. The State has not explicitly waived its immunity from the Tribe's count two.

A state can also waive its immunity by its litigation conduct. *See, e.g., Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613 (2002) (holding that a state waived its Eleventh Amendment immunity by removing an action to federal court). In general, a party who files a complaint waives jurisdictional objections to a compulsory counterclaim—that is, to a claim that "arises out of the transaction or

occurrence that is the subject matter of the" complaint. Fed. R. Civ. P. 13(a)(1)(A).

The principle applies to a state: "when a state waives its sovereign immunity by

litigation conduct, that waiver opens the door to counterclaims regarded as

compulsory within the meaning of Federal Rule of Civil Procedure 13(a)." *Bd. of*

*Regents of Univ. of Wis. Sys. v. Phoenix Intern. Software, Inc.*, 653 F.3d 448, 470

(7th Cir. 2011).

Under the law of this circuit, however, a state's waiver of its immunity is

limited to relief that mirrors the relief sought by the state itself:

> [W]hen the sovereign sues it waives immunity as to claims of the
> defendant which assert matters in recoupment—arising out of the
> same transaction or occurrence which is the subject matter of the
> government's suit, and to the extent of defeating the government's
> claim but not to the extent of a judgment against the government
> which is affirmative in the sense of involving relief different in
> kind or nature to that sought by the government or in the sense of
> exceeding the amount of the government's claims; but the
> sovereign does not waive immunity as to claims which do not meet
> the 'same transaction or occurrence test' nor to claims of a
> different form or nature than that sought by it as plaintiff nor to
> claims exceeding in amount that sought by it as plaintiff.

*Frederick v. United States*, 386 F.2d 481, 488 (5th Cir. 1967) (footnotes omitted).

*Frederick* is binding in the Eleventh Circuit. *See Bonner v. City of Prichard, Ala.*,

661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

The takeaway is this. By filing a lawsuit, a state waives its immunity only

from a claim that meets two conditions: (1) the claim arises from the same

transaction or occurrence as the state's claim, and (2) the claim seeks relief of the

same kind as, and does not exceed the amount of, the state's claim. Here the first

condition is easily met. But the second condition limits the scope of the State's

waiver of its immunity.

The State's claims deal only with the five-year limitation. The State's waiver

of immunity thus extends only to the Tribe's claim that the State failed to

negotiate in good faith for an extension of the five-year period. The Tribe's claim

based on the State's duty to negotiate over other issues would, if successful, lead

to relief far exceeding an extension of the five-year period. *See* 25 U.S.C. §

2710(7)(B)(iii)-(vii). This claim is different in "kind and nature" and seeks relief

far in excess of that sought by the State.

To be sure, the Tribe asserts that the State's failure to negotiate in good faith

in general—including the failure to negotiate about issues other than the five-year

limitation—is a defense to the State's claims. Perhaps so. But *Frederick* measures

a waiver by the claims of the sovereign, not by the opposing party's defenses. The

State has not waived its immunity from the Tribe's claim of failure to negotiate on

issues other than the five-year limitation.

B

The State says its entry into the Compact in 2010 relieved the State from any

obligation to negotiate further during the Compact's 20-year term. As the State

frames it, IGRA requires a state to negotiate a compact in the first instance, not to renegotiate during a compact's existence. Nothing in the statute supports that assertion, and the assertion makes no sense. Negotiation to one extent or another will or at least should always occur when a compact nears the end of its term and a tribe seeks to extend the existing compact or enter a new one. And changed circumstances may make it reasonable to enter negotiations on changes to a compact. IGRA obligates a state to participate in such negotiations in good faith.

To be sure, good faith may not require a state to reopen *recently concluded* negotiations. *See Wisconsin Winnebago Nation v. Thompson*, 22 F.3d 719, 724 (7th Cir. 1994). And a tribe that has entered into a compact may have no claim against a state for failing to negotiate *that very compact* in good faith. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. Cal.*, 813 F.3d 1155, 1172 (9th Cir. 2015). But the fact that there is an existing compact does not, without more, relieve a state from its duty to negotiate in good faith. *See Wisconsin Winnebago*, 22 F.3d at 724; *Rincon Band of Luiseno Mission Indians v. Schwarzenegger*, 602 F.3d 1019 (9th Cir. 2010).

Here the State plainly had a duty to negotiate in good faith on an extension of the five-year limitation. The understanding of both the Tribe and the State, when they entered into the Compact, was that they would revisit the issue before the five years ended. This is confirmed not only by the testimony of the Tribe's negotiator,

which I credit, but also by the statute that authorized the Governor to negotiate the

Compact in the first instance. The statute provided:

> It is the intent of the Legislature to review a compact entered into
> under the provisions of this section within 5 years after the
> compact is approved. It is the intent of the Legislature to consider
> the authorization of additional Class III games for operation by the
> Tribe based upon successful implementation of the compact and
> the history of compliance with the compact.

*See* Ch. 2009-170, sec. 1, Laws of Fla. (2009); Fla. Stat. § 285.710(11) (2009).

To be sure, this same language did not make it into the Compact itself or

into the legislation ratifying the Compact. *See* Ch. 2010-29, sec. 1, Laws of Fla.

(2010). But IGRA imposed a duty on the State to negotiate on this issue in good

faith.

C

Even though the State had a duty to negotiate in good faith, the Tribe is not

entitled to a judgment at this time on its failure-to-negotiate claim. Three

considerations drive this conclusion.

First, as it turns out, the five-year limitation never took hold, because, as set

out above, an exception was triggered. The duty to negotiate about the Tribe's

ability to continue to provide banked games is no longer of consequence.

Second, any duty to negotiate on other subjects—on the Tribe's ability to

provide roulette or craps, for example, or on any extension of the Compact beyond

the 20-year term—is barred by sovereign immunity.

Third, the Tribe and, at least to a point, the State negotiated in good faith about the Tribe's proposed modifications to the Compact. The State was represented in the negotiations by the Governor (or at least members of his staff), officials of the Department of Business and Professional Regulation, a state senator, and a member of the state House of Representatives. These officials negotiated and indeed reached an agreement, which the Governor signed. The breakdown came when the Florida Legislature did not approve or even vote on the negotiated agreement.

The Tribe argues, with considerable force, that the Legislature did not act in good faith. Bills that never reached the floor called for an increase in revenue to the State and a decrease in the Tribe's exclusivity, suggesting bad faith. *See Rincon*, 602 F.3d at 1037-39 (9th Cir. 2010); 25 U.S.C. § 2710(d)(4). But a bill that does not pass—and more clearly, a bill that never makes it to the floor—is not an act of the Legislature. Such a bill may give little indication of what the Legislature did or did not consider.

That a state must negotiate in good faith does not mean the state must agree to terms. Even good-faith negotiations sometimes fail. Here, in light of the ruling that the five-year limitation no longer applies and the State's sovereign immunity from the claim of failure to negotiate on other matters, and as a matter of equitable

discretion, no further declaratory or injunctive relief will be granted.

## XI

The Tribe and the State entered into the 2010 Compact with the Florida Legislature's formal approval. The Compact authorized the Tribe to conduct banked card games for five years or 20, depending on future events. As it turned out, the Compact authorized the Tribe to conduct banked card games for 20 years. The Tribe is entitled to relief confirming this conclusion. The Tribe is not entitled to any additional relief on its failure-to-negotiate claim. Accordingly,

IT IS ORDERED:

1. The State's oral motion to voluntarily dismiss count two of its complaint in Case No. 4:15cv588 is granted. Count two in that action is voluntarily dismissed without prejudice.

2. It is declared that the Seminole Tribe of Florida has the right under the 2010 Compact to provide banked card games for the Compact's entire 20-year term at the seven locations listed in Part IV.B. of the Compact.

3. All other claims in these consolidated cases are dismissed.

4. The clerk must enter a separate judgment in each case.

5. The clerk must close the file.

SO ORDERED on November 9, 2016.

s/Robert L. Hinkle_____
United States District Judge